# Exhibit 1

**BRYAN CAVE LEIGHTON PAISNER LLP**
Sharon Z. Weiss
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200
E-Mail: sharon.weiss@bclplaw.com

Justin Kingsolver, Pro Hac Vice Forthcoming
Two North Central Ave., Suite 2100
Phoenix, Arizona 85004-4406
Telephone: (602) 364-7036
Facsimile: (602) 364-7070
E-Mail: justin.kingsolver@bclplaw.com

Susan Carney Lynch, Pro Hac Vice Forthcoming
1155 F. Street NW, Suite 700
Washington, DC 20004-1357
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
E-Mail: susan.lynch@bclplaw.com

*Attorneys for Plaintiffs Ascent Health Services LLC,*
and *Express Scripts, Inc.*

**Electronically FILED by Superior Court of California, County of Los Angeles 9/04/2026 11:09 AM David W. Slayton, Executive Officer/Clerk of Court, By M. Aguirre, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

ASCENT HEALTH SERVICES LLC; EXPRESS SCRIPTS, INC.,

Plaintiffs,

vs.

PLATINUM EQUITY, LLC; PLATINUM EQUITY ADVISORS, LLC; BLAIR FUNDING, LLC; BRIGADE CAPITAL MANAGEMENT, L.P.; FIRST EAGLE ALTERNATIVE CREDIT, LLC; FIRST EAGLE ALTERNATIVE CREDIT EU, LLC; LCM ASSET MANAGEMENT LLC; SOUND POINT CAPITAL MANAGEMENT, LP; SOUND POINT LUNA, LLC; BLUEMOUNTAIN FUJI MANAGEMENT, LLC; and JOHN DOE DEFENDANTS 1-200,

Defendants.

26STCV28230

**COMPLAINT FOR:**

- **INDUCING BREACH OF CONTRACT;**
- **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**
- **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW; AND,**
- **RESTITUTION (UNJUST ENRICHMENT/QUANTUM MERUIT).**

**JURY TRIAL DEMANDED**

**INTRODUCTION**

1. Plaintiffs Ascent Health Services LLC ("Ascent") and Express Scripts, Inc. ("Express Scripts" and together with Ascent, "Plaintiffs") hereby bring these claims against Defendants Platinum Equity, LLC ("Platinum"), Platinum Equity Advisors, LLC ("Platinum Advisors," and together with Platinum, "Platinum Defendants"), Blair Funding, LLC ("Blair Funding"), Brigade Capital Management, L.P. ("Brigade Capital"), First Eagle Alternative Credit, LLC ("First Eagle"), First Eagle Alternative Credit EU, LLC ("First Eagle EU"), LCM Asset Management LLC ("LCM Asset Management"), Sound Point Capital Management, LP ("Sound Point"), Sound Point Luna, LLC ("Sound Point Luna"), BlueMountain Fuji Management, LLC ("BlueMountain"), and John Doe Defendants 1-200 (together with Platinum, Platinum Advisors, Blair Funding, Brigade Capital, First Eagle, First Eagle EU, LCM Asset Management, Sound Point, Sound Point Luna, and BlueMountain, the "Defendants"), (i) for intentionally inducing LifeScan, Inc. ("LifeScan"), a wholly owned indirect subsidiary of Platinum and/or Platinum Advisors, to breach certain Rebate Agreements (as defined below, the "Rebate Agreements") with Plaintiffs, (ii) for intentionally interfering with LifeScan's performance of its obligations to make rebate payments under the Rebate Agreements to Plaintiffs, (iii) for violating the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and (iv) unjustly enriching themselves at the expense of Plaintiffs by diverting to themselves all of the money LifeScan received as a result of Plaintiffs' performance of Plaintiffs' contractual obligations under the Rebate Agreements, without paying Plaintiffs anything for those services.

2. Plaintiffs have suffered hundreds of millions of dollars in damages as a result of Defendants' misconduct, including lost revenues, lost income, and lost opportunities. Given the flagrant and intentional nature of Defendants' misconduct, Plaintiffs also seek punitive and exemplary damages in an amount to be determined at trial.

## PARTIES

3. Plaintiff Ascent is a Delaware limited liability company. Ascent is an independent joint venture held by multiple owners, with a branch office registered in Schaffhausen, Switzerland. Ascent is a group purchasing organization ("GPO") that negotiates and administers rebates with pharmaceutical and medical device manufacturers on behalf of other entities, including Plaintiff Express Scripts.

4. Plaintiff Express Scripts is a Delaware corporation. Express Scripts is a pharmacy benefit manager ("PBM") with its principal place of business and headquarters in St. Louis, Missouri. Among other things, Express Scripts manages prescription drug and medical device benefits for health insurance plans and employers.

5. Defendant Platinum is a Delaware limited liability company with its principal place of business in Beverly Hills, Los Angeles County, California. The only member of Platinum is an estate planning trust of Tom Gores, who resides in California. Tom Gores is a co-trustee of the estate planning trust and is also the manager of Platinum.

6. Defendant Platinum Advisors is a Delaware limited liability company with its principal place of business in Beverly Hills, Los Angeles County, California. Platinum Advisors is principally owned and controlled by Tom Gores and his affiliates.

7. John Doe Defendants 1-100 are affiliates and subsidiaries of Platinum Defendants who participated in and/or benefitted from, Platinum Defendants' misconduct alleged herein.

8. Defendant Blair Funding is a Delaware limited liability company. On information and belief, Blair Funding's principal place of business is in Pennsylvania. FS Credit Opportunities Corporation ("FSCO") is the ultimate corporate parent of Blair Funding. FSCO is a Maryland corporation with its principal place of business in New York. Thus, Blair Funding's members and owners, direct and indirect, reside in Maryland and New York.

9. Defendant Brigade Capital is a Delaware limited partnership with its principal place of business in New York. On information and belief, Brigade's partners and owners, direct and indirect, reside in New York, New Jersey, Connecticut, Colorado, South Carolina, Delaware and Virginia.

10. Defendant First Eagle is a Delaware limited liability company with its principal place of business in Massachusetts. First Eagle's members and owners, direct and indirect, reside in Delaware and New York. In particular, First Eagle is a wholly owned subsidiary of First Eagle Investment Management, LLC ("FEIM"). FEIM is a Delaware limited liability company with its principal place of business in New York. FEIM is a subsidiary of First Eagle Holdings, Inc. ("FEHI"), which is the direct owner of at least 75% of the equity interest in FEIM. FEHI is a Delaware corporation with its principal place of business in New York.

11. First Eagle EU is a Delaware limited liability company. On information and belief, FEHI owns, directly or indirectly, at least 75% of the equity in First Eagle EU, thus First Eagle EU's members and owners, direct and indirect, reside in Delaware and New York.

12. Defendant LCM Asset Management is a Delaware limited liability company with its principal place of business in Illinois. On information and belief, LCM Asset Management's members and owners, direct and indirect, are residents of the Bailiwick of Guernsey.

13. Defendant Sound Point is a Delaware limited partnership with its principal place of business in New York. Blue Owl Capital Inc. ("Blue Owl") is a publicly traded Delaware corporation with its principal place of business in New York. Blue Owl is the indirect owner of at least 75% of the equity interest of Sound Point. Thus Sound Point's partners and owners, direct and indirect, are residents of Delaware and New York.

14. Sound Point Luna is a Delaware limited liability company with its principal place of business in New York. Sound Point owns at least 75% of the equity in Sound Point Luna, and as set out in ¶ 13, *supra*, Sound Point's partners and owners, direct and indirect, are residents of Delaware

and New York. In addition, at least 25% of Sound Point Luna's equity is owned indirectly by Assured Guarantee US Holdings Inc., a Delaware corporation with its principal place of business in New York. Thus Sound Point Luna's members and owners, direct and indirect, are residents of New York and Delaware.

15. Defendant BlueMountain is a Delaware limited liability company with its principal place of business in New York. At least 75% of the equity of BlueMountain is owned by BSOF Fuji Series A Inc., a Delaware corporation. Thus BlueMountain's members and owners, direct and indirect, reside in Delaware.

16. John Doe Defendants 101-200 (together with Blair Funding, Brigade Capital, First Eagle, First Eagle EU, LCM Asset Management, Sound Point, Sound Point Luna, and BlueMountain, the "Lender Defendants") are other first and second lien lenders to LifeScan who participated in and/or benefitted from, Platinum Defendants' misconduct alleged herein.

## FACTUAL ALLEGATIONS

17. Defendant Platinum is a private equity firm, founded in 1995 by Tom Gores.

18. As of December 31, 2025, Platinum and its affiliate Platinum Advisors had more than $47 billion in assets under management.

19. LifeScan is a manufacturer of medical devices.

20. Specifically, LifeScan manufactures and sells medical devices designed to monitor blood glucose levels in individuals with diabetes.

21. LifeScan was owned by Johnson & Johnson until 2018, when Johnson & Johnson sold LifeScan to Platinum for $2.1 billion.

22. Platinum, through its subsidiaries, was at all relevant times the ultimate equity owner of LifeScan.

23. Through Platinum's ownership of LifeScan, Platinum and the other Platinum

Defendants exercised control over LifeScan's business decisions, including all of the conduct described herein.

24. The Lender Defendants were LifeScan's secured creditors at all relevant times.

25. As LifeScan's secured creditors, the Lender Defendants also exercised significant influence and *de facto* control over LifeScan's business decisions.

26. LifeScan consistently generated more than $1 billion in revenue annually prior to 2021 and ended 2022 with more than $909 million in revenue.

27. LifeScan's financial position, however, deteriorated in the years leading up to 2025 due to increasing competition from other device manufacturers.

28. LifeScan pays management fees and expense reimbursements to Platinum Advisors.

***PBMs***

29. LifeScan sells its medical devices to wholesalers, who then sell the devices to pharmacies.

30. A Pharmacy Benefit Manager (PBM) provides many services relating to managing its clients' pharmacy benefits. A PBM's clients include health plans, employers and unions that provide pharmacy benefits to its members.

31. Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. They serve several different functions in assisting their clients with designing and administering prescription drug benefits. For example, they:

- offer and maintain formularies of covered drugs and certain medical devices (including LifeScan's blood glucose monitoring products);
- negotiate rebates with drug manufacturers;
- administer the plan's coverage rules, including processing authorization requests, managing compliance with coverage requirements, conducting medical-necessity

reviews, and administering quantity limits; and

- process claims, including determining whether a drug is covered, the amount the beneficiary owes, and the amount the plan owes the pharmacy.

32. In developing formularies to offer their clients, PBMs consider the clinical value of drugs and, where appropriate, the net cost of drugs to its clients.

33. Group Purchasing Organizations (GPOs) like Plaintiff Ascent can play a similar role, negotiating and administering rebate agreements (and providing services related to rebate programs) with drug and certain medical device manufacturers on behalf of clients that often include PBMs.

34. Patients typically prefer to purchase drugs and medical devices that are covered by their health plans. Inclusion on formularies is thus often important to drug and medical device manufacturers: coverage by PBM formularies provides manufacturers with access to patients who may not otherwise want to—or cannot afford— the full price of branded drugs.

35. PBMs (such as Plaintiff Express Scripts) and GPOs (such as Plaintiff Ascent) negotiate with drug and certain medical device manufacturers (such as LifeScan) for rebates tied to the utilization of drugs and medical devices by patients. PBMs and GPOs can leverage the collective negotiating power of their clients and the significant number of lives covered to try and lower the cost of prescription drugs and certain medical devices for their respective clients.

36. Manufacturers offer rebates to PBMs and GPOs in many ways. Manufacturers can offer rebates for drugs that are "exclusive" on a formulary, drugs that are included on a formulary with one or a small number of competitors, or inclusion at all. In general, manufacturers offer the largest rebates to be "exclusive" on a formulary.

37. When clinically appropriate, PBMs consider rebates in developing the formularies they offer to clients to help clients pay the lowest net cost—i.e. the list price of a drug less any payable rebates—for drugs they elect to cover.

***The Rebate Agreements***

38. Each Plaintiff separately entered into agreements with LifeScan (the "Rebate Agreements"). In those agreements, LifeScan agreed to offer rebates for its medical devices if those devices were included on formularies utilized by clients.

39. LifeScan, a California corporation, was a party to each of the Rebate Agreements.

40. In or around January 2022, LifeScan and Ascent entered into an "Amended and Restated Rebate Program Agreement." In or around October 1, 2019, LifeScan and Ascent entered into an "Inflation Agreement."

41. Under the terms of LifeScan's Rebate Agreement with Ascent, including subsequent amendments thereto, LifeScan agreed to pay Ascent, on a monthly basis, rebates and related fees for LifeScan products that qualified under the terms of Ascent's agreements with LifeScan. These payments were not discretionary, they were mandatory.

42. LifeScan's Rebate Agreement with Ascent was valid and enforceable at all times relevant to this action.

43. LifeScan entered into Rebate Agreements with Express Scripts. Two such agreements are relevant here. First, on or around December 1, 2019, LifeScan and Express Scripts entered into a "Preferred Savings Grid Rebate Agreement for Medicare Advantage." Second, on or around November 1, 2019, LifeScan and Express Scripts entered into a "Preferred Savings Grid Rebate Program Agreement for Managed Medicaid and QRPDP."

44. Under the terms of LifeScan's Rebate Agreements with Express Scripts, including subsequent amendments thereto, LifeScan agreed to pay Express Scripts, on a monthly basis, rebates and related fees for LifeScan products utilized by members of Express Scripts' clients. These payments were not discretionary; they were mandatory.

45. LifeScan's Rebate Agreements with Express Scripts were valid and enforceable at all

times relevant to this action.

46. Pursuant to these Rebate Agreements, LifeScan paid all amounts invoiced by Plaintiffs until approximately October of 2024.

47. The Rebate Agreements were essential to LifeScan's business. In particular, in the United States, LifeScan's Rebate Agreements were key to placing LifeScan's products on formularies and thus facilitating the sale of LifeScan's products to the millions of customers who are covered by insurance and are not inclined to pay out-of-pocket for such products.

48. Absent its agreement to offer highly competitive rebates, LifeScan would risk exclusion from formularies or replacement on formularies by other manufacturers.

***The Forbearance Agreement***

49. In the fall of 2024, Defendants were scheming to enhance their own financial positions at LifeScan at the expense of LifeScan's rebate counterparties, including Plaintiffs. In furtherance of that scheme, on October 1, 2024, Defendants used their control over LifeScan to cause LifeScan enter into a "Forbearance Agreement" with Defendants.

50. In the Forbearance Agreement, Defendants required LifeScan to agree to cease making rebate payments to PBMs, GPOs, and related entities, including Plaintiffs. This was an extraordinary provision to include in a Forbearance Agreement. It is extremely atypical and not an accepted market practice for lenders to forbid their borrower from paying specific, undisputed debts. But Defendants did so here in order to misappropriate cash from LifeScan that would otherwise be payable to rebate counterparties, allowing them to access such cash for their own use, all the while reaping the benefits of LifeScan remaining on the Plaintiffs' formularies.

51. As a result of Defendants' requirement that LifeScan cease making rebate payments to PBMs, GPOs, and related entities, including Plaintiffs, LifeScan stopped making the contractually obligated rebate payments to Plaintiffs during November of 2024.

52. LifeScan's failure to make rebate payments under the Rebate Agreements was a breach of LifeScan's central obligation under the Rebate Agreements.

53. Because Defendants were the sole owners or secured creditors of LifeScan, Defendants effectively controlled all of LifeScan's decisions, including LifeScan's decision to stop making rebate payments under the Rebate Agreements.

54. The timing of LifeScan's failure to make rebate payments was calculated to be as harmful to Plaintiffs and the other PBMs as possible. In particular, Plaintiffs and the PBMs announce their commercial formularies each year in October, which will be in effect the following calendar year.

55. By waiting to stop making rebate payments until after LifeScan had been included on Plaintiffs' 2025 commercial formularies, Defendants knew that it would be extremely difficult and burdensome for Plaintiffs to remove LifeScan products from their formularies during calendar year 2025. Thus even though LifeScan would not be making the rebate payments it owed under the Rebate Agreements, there would be a period of time in 2025 in which Plaintiffs would still have to cover purchases of LifeScan products by their clients' insureds without receiving any rebate compensation.

56. As set out below, while LifeScan was breaching its agreement to make rebate payments owed to Plaintiffs under the Rebate Agreements, Defendants would be able to use their control over LifeScan to pay themselves management fees and/or unscheduled debt repayments.

57. Defendants did just that. Defendants allowed LifeScan to continue making rebate payments to Plaintiffs through September of 2024.

58. As a result, in October of 2024, Plaintiffs included LifeScan on many of their formularies for the 2025 calendar year, just as Defendants intended.

59. When LifeScan stopped making rebate payments to Plaintiffs after October of 2024, Plaintiffs could not simply remove LifeScan from their formularies, just as Defendants intended.

Instead, Plaintiffs were forced in the first instance to bear almost the entire cost of LifeScan's products, until Plaintiffs could engage in burdensome negotiations with their clients to remove LifeScan from their formularies and replace them with other products.

60. By using their control over LifeScan, a California corporation, to enter into the Forbearance Agreements and breach the Rebate Agreements, Defendants' actions were specifically directed at California.

***Plaintiffs' Losses From Defendants' Misconduct***

61. LifeScan and various of its affiliates filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on July 15, 2025.

62. In its Chapter 11 filing, LifeScan acknowledged that it owed $824.5 million in rebate payments overall to Plaintiffs and other PBMs.

63. In particular, LifeScan acknowledged that it had failed to make more than $232 million in rebate payments to Plaintiffs under the Rebate Agreements.

64. Plaintiffs expressly preserved the claims and causes of action alleged herein by specifically opting out of third-party releases as ordered by the Bankruptcy Court.

65. Ultimately, because Defendants directed LifeScan to stop making rebate payments it owed under the Rebate Agreements, LifeScan failed to make more than $232 million in rebate payments to Plaintiffs.

66. While the Forbearance Agreements prohibited LifeScan from making contractually required rebates to Plaintiffs and other PBMs, Defendants arranged for the Forbearance Agreements to expressly allow LifeScan to continue paying "professional fees and expenses" and "customary director fees and expenses" to its equity sponsors, including Platinum Defendants and other Defendants.

67. Thus, even after LifeScan began breaching the Rebate Agreements by withholding

contractually required rebates and fees from Plaintiffs—and notwithstanding LifeScan's financial difficulties—LifeScan was at all times allowed to pay Defendants—including LifeScan's owner—for the "management" and "consulting" services that private equity funds customarily charge their portfolio companies.

68. Public bankruptcy filings show that LifeScan continued paying these "professional fees and expenses" and "customary director fees and expenses" to Defendants pursuant to the Forbearance Agreements from November 2024 through July 2025, during which time LifeScan failed to make contractually required payments to Plaintiffs under the Rebate Agreements.

69. In addition, Defendants caused LifeScan to use the money that it was saving by not making its contractually obligated rebate payments to make hundreds of millions of dollars of unscheduled paydowns of the principal balance of its loans to the Lender Defendants.

70. By directing LifeScan to enter the Forbearance Agreements and withhold rebates, Defendants induced LifeScan to breach its contractual obligations to Plaintiffs under the plain terms of the Rebate Agreements and instead redirected those funds to Defendants' own accounts.

71. As LifeScan's owners and private equity sponsors, the Platinum Defendants knew that LifeScan was experiencing significant financial difficulties at the time LifeScan entered the Forbearance Agreements in October 2024. But instead of helping LifeScan meet its contractual obligations to Plaintiffs, Platinum Defendants engaged in obvious self-dealing, taking steps to ensure that its own "management" fees were paid.

72. Defendants therefore intentionally, maliciously, and oppressively caused LifeScan to breach the Rebate Agreements with Plaintiffs in order to enrich themselves.

## CLAIMS FOR RELIEF

### Count I - Inducing Breach of Contract

***All Defendants***

73. Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if fully alleged herein.

74. The Rebate Agreements were contracts between Plaintiffs and LifeScan.

75. Defendants knew of the Rebate Agreements, as the Rebate Agreements were the primary mechanism through which LifeScan brought its products to market and Defendants specifically referenced the Rebate Agreements in numerous documents, including the Forbearance Agreements.

76. Defendants intended to cause LifeScan to breach the Rebate Agreements by causing LifeScan to cease making rebate payments required under the Rebate Agreements.

77. Defendants' demand that LifeScan cease making rebate payments under the Rebate Agreements caused LifeScan to breach the Rebate Agreements.

78. Defendants specifically intended that LifeScan's breach of the Rebate Agreements after October 2024 would assure that Plaintiffs included LifeScan's products on Plaintiffs' 2025 formularies, leaving Plaintiffs stuck with the full cost of LifeScan's products without any offsetting rebate payments.

79. Plaintiffs were harmed by LifeScan's cessation of rebate payments under the Rebate Agreements, losing hundreds of millions of dollars of unpaid rebates.

80. Defendants' demand that LifeScan cease making rebate payments to Plaintiffs was the primary or a substantial factor in causing Plaintiffs' harm.

81. Defendants' inducement of LifeScan to breach the Rebate Agreements caused hundreds of millions of dollars in damages to Plaintiffs.

82. Defendants' inducement of LifeScan to breach the Rebate Agreements was knowing and intentional, undertaken with malice and with reckless indifference to the oppression and damages Plaintiffs would suffer as a result.

**Count II - Intentional Interference With Contractual Relations**

***All Defendants***

83. Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if fully alleged herein.

84. The Rebate Agreements were contracts between Plaintiffs and LifeScan.

85. Defendants knew of the Rebate Agreements, as the Rebate Agreements were the primary mechanism through which LifeScan brought its products to market and Defendants specifically referenced the Rebate Agreements in numerous documents, including the Forbearance Agreements.

86. Defendants' demand that LifeScan cease making rebate payments under the Rebate Agreements prevented LifeScan's performance of its obligations to make rebate payments and/or made LifeScan's performance more expensive or difficult.

87. By demanding that LifeScan stop making rebate payments under the Rebate Agreements, Defendants intended to disrupt LifeScan's performance of its obligation to make rebate payments under the Rebate Agreements.

88. By demanding that LifeScan stop making rebate payments under the Rebate Agreements, Defendants knew that disruption of LifeScan's performance of its obligation to make rebate payments under the Rebate Agreements was substantially certain to occur.

89. Defendants knew that if LifeScan stopped making rebate payments under the Rebate Agreements after October 2024, it would assure that Plaintiffs included LifeScan's products on Plaintiffs' 2025 formularies. Thus, when LifeScan stopped making rebate payments, it would leave

Plaintiffs stuck with the full cost of LifeScan's products without any offsetting rebate payments.

90. Plaintiffs were harmed by LifeScan's cessation of rebate payments under the Rebate Agreements, losing hundreds of millions of dollars of unpaid rebates.

91. Defendants' demand that LifeScan cease making rebate payments was the primary or a substantial factor in causing Plaintiffs' harm.

92. Defendants' interference with LifeScan's performance of its obligation to make rebate payments to Plaintiffs under the Rebate Agreements caused hundreds of millions of dollars in damages to Plaintiffs.

93. Defendants' interference with LifeScan's performance of its obligation to make rebate payments to Plaintiffs under the Rebate Agreements was knowing and intentional, undertaken with malice and with reckless indifference to the oppression and damages Plaintiffs would suffer as a result.

**Count III – Unfair Competition (Cal. Bus. & Prof. Code § 17200 *et seq.*)**

***All Defendants***

94. Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if fully alleged herein.

95. California law prohibits "any unlawful, unfair, or fraudulent business act." Cal. Bus. & Prof. Code § 17200.

96. Defendants engaged in the business acts of directing LifeScan to enter the Forbearance Agreements and subsequently breach its Rebate Agreements with Plaintiffs. On information and belief, these business acts occurred in the state of California.

97. Defendants' business acts of directing LifeScan to breach the Rebate Agreements were unlawful because Defendants induced LifeScan to breach its contractual obligations to Plaintiffs, tortiously interfered with LifeScan's Rebate Agreements with Plaintiffs, and unjustly enriched

themselves at the expense of Plaintiffs.

98. Defendants' business acts of directing LifeScan to breach the Rebate Agreements are and were unfair because they caused Plaintiffs substantial harm that is not outweighed by any benefit to consumers or competition, and because Plaintiffs could not have easily avoided the harm incurred.

99. Plaintiffs have suffered injury in fact and incurred hundreds of millions of dollars in economic harm as a result of Defendants' unfair and unlawful business practices.

**Count IV – In the Alternative, Restitution (Unjust Enrichment/Quantum Meruit)**

***All Defendants***

100. Plaintiffs reallege and incorporate by reference all of the foregoing paragraphs as if fully alleged herein.

101. Plaintiffs fulfilled their part of the Rebate Agreements.

102. Defendants knew of LifeScan's obligations under the Rebate Agreements to make rebate payments to Plaintiffs.

103. Despite that knowledge, Defendants used their influence over LifeScan to cause LifeScan to breach its contractual obligations and withhold rebate payments to Plaintiffs due under the Rebate Agreements.

104. Moreover, Defendants used their influence over LifeScan to cause LifeScan to withhold the money it owed to its business partners, including Plaintiffs, and to pay that money to Defendants themselves instead.

105. Accordingly, Defendants have unjustly enriched themselves at Plaintiffs' expense.

106. Defendants must restore to Plaintiffs the unjust benefits Defendants received by causing LifeScan to withhold the rebate payments LifeScan owed to Plaintiffs under the Rebate Agreements, and to instead divert to Defendants funds otherwise available to pay the obligations owed to Plaintiffs under the Rebate Agreements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1. For general damages in an amount according to proof at trial;

2. For compensatory damages for all harm suffered as a direct and proximate result of Defendants' tortious interference with contract, in an amount according to proof;

3. For punitive and exemplary damages pursuant to California Civil Code section 3294, in an amount sufficient to punish Defendants and to deter similar conduct, on the grounds that Defendants acted with oppression, fraud, and/or malice;

4. For restitution and/or disgorgement of all amounts by which Defendants were unjustly enriched as a result of their wrongful conduct, in an amount according to proof;

5. For pre-judgment interest at the maximum rate permitted by law;

6. For post-judgment interest as provided by law;

7. For costs of suit herein incurred;

8. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims and issues.

Respectfully submitted this 3rd date of September, 2026,

Sharon Z. Weiss
BRYAN CAVE LEIGHTON PAISNER LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200
E-Mail: sharon.weiss@bclplaw.com

Justin Kingsolver, Pro Hac Vice Forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Ave., Suite 2100
Phoenix, Arizona 85004-4406
Telephone: (602) 364-7036
Facsimile: (602) 364-7070
E-Mail: justin.kingsolver@bclplaw.com

Susan Carney Lynch, Pro Hac Vice Forthcoming
BRYAN CAVE LEIGHTON PAISNER LLP
1155 F. Street NW, Suite 700
Washington, DC 20004-1357
Telephone: (202) 508-6000
Facsimile: (202) 508-6200
E-Mail: susan.lynch@bclplaw.com

*Attorneys for Plaintiffs Ascent Health Services LLC, and Express Scripts, Inc.*